**[J-18-2017]**
**IN THE SUPREME COURT OF PENNSYLVANIA**
**EASTERN DISTRICT**

**SAYLOR, C.J., BAER, TODD, DONOHUE, DOUGHERTY, WECHT, MUNDY, JJ.**

| | | |
|---|---|---|
| ANTHONY BURKE, BY HIS PARENT AND NATURAL GUARDIAN, JOHN BURKE, | : | No. 23 EAP 2016 |
| | : | |
| | : | Appeal from the Judgment of Superior |
| | : | Court entered on 11/13/15 at No. 2299 |
| Appellee | : | EDA 2011, affirming and remanding the |
| | : | order entered on 7/19/11 in the Court of |
| | : | Common Pleas, Philadelphia County, |
| v. | : | Civil Division at No. 2226 February |
| | : | Term 2010 |
| | : | |
| INDEPENDENCE BLUE CROSS, | : | |
| | : | ARGUED: March 8, 2017 |
| Appellant | | |

***OPINION***

**CHIEF JUSTICE SAYLOR**                    **DECIDED: October 5, 2017**

The questions presented concern whether a law requiring private insurance companies to provide coverage for treatment of autism spectrum disorders invalidates express, contractual place-of-services exclusions pertaining to the delivery of such services in schools.

Among other modifications to the Insurance Company Law of 1921,[1] Act 62 of 2008 amended this statutory regime to require that certain group health insurance policies provide coverage for the "treatment of autism-spectrum disorders," subject to an

---

[1] Act of May 17, 1921, P.L. 682, No. 284 (as amended 40 P.S. §§341 - 991.2610).

initial $36,000 maximum benefit annually.[2]  Per this amendment -- denominated by the Insurance Department as the "Autism Coverage Law" -- relevant treatment is defined to include "medically necessary pharmacy care, psychiatric care, psychological care, rehabilitative care and therapeutic care" prescribed and provided in accordance with Act 62.  40 P.S. §764h(f)(14).

The Law specifically recognizes therapy or treatment in the nature of "applied behavioral analysis," or "ABA," which is defined as:

> the design, implementation and evaluation of environmental modifications, using behavioral stimuli and consequences, to produce socially significant improvement in human behavior or to prevent loss of attained skill or function, including the use of direct observation, measurement and functional analysis of the relations between environment and behavior.

*Id.* §764h(f)(1).  Also of particular relevance to this appeal, the statute allows for some policy-based restrictions upon coverage, as follows:

> Coverage under this section shall be subject to copayment, deductible and coinsurance provisions and *any other general exclusions or limitations* of a health insurance policy or government program to the same extent as other medical services covered by the policy or program are subject to these provisions.

*Id.* §764h(c) (emphasis added).

In April 2009, the Insurance Department published a notice offering guidance concerning the "general exclusions or limitations" language quoted above.  There, the Department took the position that the Law forbids policy exclusions that eliminate coverage for the types of treatment for autism spectrum disorders specifically delineated in the statute, such as ABA.  According to the Department, the statutory terms

---

[2] Act of July 9, 2008, P.L. 885, No. 62, §3 (codified as 40 P.S. §764h) (the "Autism Coverage Law" or the "Law").

sanctioning general exclusions pertained only to services or treatments for autism spectrum disorders that were not particularized in the enactment. By way of example, the Department explained, "if a policy generally excludes acupuncture treatment, and an autism provider believes that acupuncture may provide some benefit to his autism patient, that particular treatment may nonetheless be excluded from the mandated coverage." Pa. Ins. Dep't, Autism Coverage; Notice 2009-03, 39 Pa. Bull. 1927 (Apr. 11, 2009).

Anthony Burke is a child who has been diagnosed with an autism-spectrum disorder. As pertinent here, throughout the first six months of 2010, Anthony and his family were covered by a group health insurance policy (the "Policy") with Appellant, Independence Blue Cross ("Insurer"),[3] maintained through the employer of John Burke, Anthony's father.[4] Initially, Anthony received ABA treatment at home.

In August 2009, before the Autism Coverage Law became effective relative to the Burkes' coverage, the family requested benefits, under the Policy, for ABA services to be provided at the parochial elementary school attended by Anthony. Insurer, however, denied coverage through an administrator of mental health benefits, on account of an express place-of-services exclusion in the Policy delineating that services would not be covered if the care was provided in certain locations, including schools.[5] After

---

[3] On July 1, 2010, the health plan converted to a different type of policy, such that the parties have agreed that Insurer cannot be accountable for coverage outside the time window from January 1, 2010, through July 1, 2010.

[4] Throughout this opinion, references to Mr. Burke are to his representational capacity, on Anthony's behalf.

[5] Specifically, the exclusion prescribes:

> Except as specifically provided in this contract, no benefits
> will be provided for services, supplies or charges:

(continued…)

unsuccessful administrative appeals to Insurer, the Burkes requested an independent external review by an agency appointed by the Department of Insurance, *see* 40 P.S. §764h(k)(1), which upheld the denial.

On Anthony's behalf, Mr. Burke filed in the common pleas court a complaint couched in the nature of a statutory appeal, *see id.* §764h(k)(2), and as a plea for declaratory and injunctive relief. He averred that Anthony had received a physician's diagnosis of Pervasive Development Disorder – Not Otherwise Specified, a form of autism spectrum disorder. Additionally, it was alleged that the doctor had prescribed ABA, including "Therapeutic Staff Support," entailing the use of a "shadow," *i.e.*, an individual who accompanies the patient throughout his daily routine to assist in maintaining focus.

In a motion for judgment on the pleadings, Mr. Burke argued that the place-of-services exclusion in the Policy was nullified, as it pertained to in-school services, by the Autism Coverage Law. In this regard, Mr. Burke relied upon the express requirement that coverage for ABA must be afforded. *See, e.g.*, Motion for Judgment on the Pleadings at 12-13 ("Defendant contends that the general exclusion of services in school allows them to circumvent the intent of Act 62 and exclude ABA coverage."). With regard to the terms of the Law allowing for exclusions, Mr. Burke took the position that the language was ambiguous, because an interpretation allowing *any* exclusion, including, for example, one for ABA services, would undermine the effect of the statute.

---

(…continued)

> • For care in a nursing home, home for the aged, convalescent home, *school*, institution for retarded children, custodial care in a skilled nursing facility.

Undated Stipulation submitted in *Burke ex rel. Burke v. Indep. Blue Cross*, No. 2226, Feb. Term 2010 (C.P. Phila.) (emphasis added).

Accordingly, Mr. Burke urged the court to apply principles of statutory construction. *See, e.g.*, *Norfolk S. Ry. Co. v. PUC*, 621 Pa. 312, 328, 77 A.3d 619, 629 (2013) ("Where ambiguities exist, [courts] employ principles of statutory construction[.]").

In terms of the language and purposes of the Autism Coverage Law, Mr. Burke stressed that the statute defines ABA to encompass the "evaluation of *environmental* modifications," subsuming the use of "direct *observation*" and analysis of the relations between "*environment*" and behavior.  40 P.S. §764h(f)(1) (emphasis added). According to Mr. Burke, absent the ability of a services provider to employ direct observation and analysis, and to design and implement environmental modifications that are effective in the school environment, ABA therapy is thwarted.[6]  Indeed, Mr. Burke posited that "to eliminate coverage of ABA in school is to eliminate an entire category of ABA."  Plaintiff's Brief at 21.

Pursuing another avenue of statutory construction, Mr. Burke further highlighted the guidance provided by the Insurance Department.  *See* 1 Pa.C.S. §1921(c)(8) (prescribing for consideration of legislative and administrative interpretations of ambiguous statutes).  He argued:

> Notice 2009-03 makes clear, that under Act 62, a policy exclusion cannot legally apply to the provision of the services specified in the statute, including Applied Behavioral Analysis.  The distinctions drawn by the Insurance Department in Notice 2009-03 would have no meaning if [Insurer] were permitted to apply a limitation that

---

[6] *See* Plaintiff's Brief dated Feb. 15, 2011, in *Burke*, 2226, Feb. Term 2010 [hereinafter "Plaintiff's Brief"], at 21 ("[T]he location or setting where ABA therapy takes place is, by definition, an inherent component of ABA."); *id.* ("ABA provided at home . . . does not, by definition, address behavioral issues at school."); *id.* ("Given the amount of time children spend in school, denying coverage for ABA in school creates an exclusion that would deny school aged children the very treatment services Act 62 was enacted to provide.").

> effectively prevented [Anthony] from receiving mandated treatment in the very environment for which it has been prescribed.

Memorandum of Law in Support of Plaintiff's Motion for Judgment on the Pleadings filed June 22, 2010, in *Burke*, No. 2226, Feb. Term 2010, at 14.[7] In this vein, Mr. Burke urged that that agency's interpretation should be afforded great deference. *See, e.g.*, *id.* at 13.

Additionally, Mr. Burke pointed to supportive letters of four legislators, including the primary sponsor of the Law, which had been entered into the record. He also invoked the principle of statutory construction sanctioning the presumption that "the General Assembly intends to favor the public interest as against any private interest." 1 Pa.C.S. §1922(5). In this regard, Mr. Burke asserted that the public interest espoused by the Law is the provision for access to treatment for children and youth with autism spectrum disorders via mandatory insurance coverage.

Accounting for Insurer's position that Anthony was entitled to auxiliary services, including ABA, from the School District of Philadelphia, Mr. Burke denied this assertion and contended that, in any event, any such entitlement would not relieve Insurer of its coverage responsibility under the Autism Coverage Law. In this line of argument, Mr. Burke pointed to a prescription, in subsection (d.1) of the enactment, specifying that:

> This section shall not be construed as requiring coverage by insurers of any service based solely on its inclusion in an individualized education program. Consistent with Federal or State law and upon consent of the parent or guardian of

---

[7] The Insurance Department submitted an *amicus* brief in the litigation before the common pleas court, consistent with its notice. *See* Memorandum of *Amicus Curiae* Pa. Ins. Dep't & Pa. Ins. Comm'r dated June 22, 2010, in *Burke*, No. 2226, Feb. Term 2010, at 9 (advocating that "[a] general exclusion may not be applied in a way that would eviscerate a mandate" in the Autism Coverage Law for treatment of autism spectrum disorders).

the covered individual, the treatment of autism spectrum disorders may be coordinated with any service included in an individualized education program. Coverage for the treatment of autism spectrum disorders shall not be contingent upon a coordination of services with an individualized education program.

40 P.S. §764h(d.1).

Mr. Burke urged that subsection (d.1) should be understood to reflect the General Assembly's intention that treatment services like ABA would be provided for, and covered, in school. *See, e.g.*, Plaintiff's Brief at 15 ("The plain language of Act 62 makes it clear that an insurer is not exempt from its obligation to cover mandated autism treatment services like ABA because these services may be available to the covered individual through his individualized education program."). Indeed, he posited that subsection (d.1) would lack any purpose if the Legislature did not intend insurers to cover treatment services such as ABA in school. *See id.* at 22.

In its response, Insurer relied centrally upon the Autism Coverage Law's explicit allowance for "any other general exclusions." 40 P.S. §764h(c). The company took the position that Mr. Burke's and the Insurance Department's various constructions of the statute were manifestly contrary to this provision's plain language.

Insurer explained that place-of-services exclusions are general in nature, in that they are not limited to treatment for autism or any other specific condition, but rather, categorically preclude benefits relating to all forms of services in particular locations. On the other hand, Insurer stressed, the Law's domain is limited to specified types of services and their associated scope. Particularly given that the statute does not identify *where* services are to be provided, Insurer maintained that it was free to exclude locations for legitimate business reasons, such as the disadvantages resulting from an insurer's inability to monitor care rendered in school settings.

Insurer explained, however, that it had no quarrel with the proposition that "a general exclusion cannot preclude coverage for autism services mandated by the statute." Memorandum of Law of Defendant dated March 1, 2011, in *Burke*, No. 0226, Feb. Term 2010 [hereinafter "Defendant's Memorandum"], at 10 n.16. Insurer elaborated as follows:

> A common example of how the mandate would apply is that when a policy does not include prescription drug benefits, as many policies do not, the autism mandate would require that autism-related prescription drugs be covered notwithstanding that the policy did not cover any other prescription drugs.

*Id.* Thus, Insurer appeared to concede that the statute did not allow for *any and all* general exclusions. Rather, at least in this discrete passage of its presentation, Insurer recognized that implementation of some general exclusions could intrude impermissibly upon the essential statutory coverage mandate.

Apparently attempting to demonstrate that the needs of autistic schoolchildren are otherwise met, Insurer continued with an extensive presentation concerning the federal government's involvement in the provision of school-based services, primarily under the Individuals with Disabilities Education Act, 20 U.S.C. §§1400 – 1487. *See, e.g.*, Memorandum of Law of Defendant dated July 12, 2010, in *Burke*, No. 0226, Feb. Term 2010, at 8 ("[T]he primary mandate for the provision of autism-related services lies with the IDEA and the School District."); Defendant's Memorandum at 16 (positing that the "IDEA imposes upon state and local educational agencies the duty to find disabled children in private schools, and provide them with necessary services, even if such services must be provided at religious schools"). With respect to subsection (d.1) of the Autism Coverage Law, Insurer portrayed this as a coordination-of-benefits provision between health plans and individual education plans. *See id.*; *see also id.* at 15 ("[T]he

autism mandate is only one portion of a more complete picture of services to which plaintiff is entitled."); *id.* at 18 (stating that the Autism Coverage Law is designed to "supplement school-based and school-funded services mandated pursuant to IDEA").[8] In this regard, Insurer acknowledged its own responsibility for coverage outside the school setting. *See id.* at 9; *see also id.* at 11 ("Subject to its general exclusion, [the Policy] covers [autism-related] services in all locations except in a school setting.").

Delving into the purposes of the enactment, Insurer explained that, in public hearings, the Secretary of Public Welfare "provided a clear understanding not only of the circumstances under which the statute was enacted, but also the mischief to be remedied, and the object to be attained." *Id.* at 11 (alluding to 1 Pa.C.S. §1921(c)). Insurer noted that the Secretary had testified that most families who are provided autism-based services are covered by private health insurance, but that their insurance did not cover such care. As a result, "families of children with autism [had] no alternative but to enroll their child in medical assistance." *Id.*, Ex. 2, at 10 (reflecting a transcription of the video-recorded testimony of the Secretary).

Insurer did not read the Insurance Department's notice as displacing place-of-services exclusions. In any event, it explained that an administrative agency's interpretation of a statute carries little weight when that interpretation is inconsistent with the statute itself. *See, e.g.*, *Office of Admin. v. PLRB*, 591 Pa. 176, 190 n.11, 916 A.2d 541, 549 n.11 (2007). With respect to the presumption that the public interest is to be favored over any private ones, Insurer asserted that the analysis "is not as simple as the private financial interest of [Insurer] versus that of providing services to autistic children," since Insurer is a nonprofit corporation. Defendant's Memorandum at 14.

---

[8] Notably, Insurer has not tendered its arguments pertaining to the IDEA to this Court in the present briefing.

The common pleas court dismissed the motion for judgment on the pleadings and treated the complaint as a statutory appeal, to be decided on the record and the briefs, supplemented by a stipulation per which Mr. Burke and Insurer agreed that: "The only issue before this court going forward is whether or not Act 62 voids the 'place of service' exclusion in the Independence Blue Cross policy for the period of January 1, 2010 through July 1, 2010."[9] The court then sustained the appeal and reversed the external review organization's approval of Insurer's denial of coverage. *See Burke ex rel. Burke v. Indep. Blue Cross*, No. 2226, Feb. Term 2010, *slip op.* at 10, 2011 WL 10525398, at *6 (C.P. Phila. July 19, 2011).

In its opinion, the common pleas court adopted Mr. Burke's position that, because ABA therapy is a treatment which specifically must be provided per the Autism Coverage Law, coverage simply cannot be subject to contractual exclusion. Initially, the court determined that Section 764h(c) is ambiguous, explaining:

> While [Section 764h(c)] does facially state that insurers may opt not to provide coverage pursuant to a "general exclusion," § 764[h](a) of the same law states that insurers must cover ABA services. Because a facial reading of these two provisions would cause them to conflict with one another, there is an ambiguity in the Statute as a whole even though there may not be one inherent in the text of § 764h(c) when viewed in isolation. . . . Beyond the tension between these two provisions, the very phrase "general exclusions" is susceptible enough to interpretation that it creates some ambiguity in and of itself.

*Id.* at 4, 2011 WL 10525398, at *2. Accordingly, the court referenced rules of statutory construction, chiefly, that "[t]he object of all interpretation and construction of statutes is to ascertain and effectuate the intention of the General Assembly." *Id.* (quoting 1

---

[9] This stipulation initially was omitted from the certified record but was later added via a joint motion to supplement. *See* Pa.R.A.P. 1926(b).

Pa.C.S. §1921(a)); *see also id.* at 8, 2011 WL 10525398, at *4 (indicating that Mr. Burke's construction "best comports with the normal canons of statutory construction, avoids the possible neutering of the Act, and gives weight to the Insurance Department's interpretation").

Consonant with the views of Mr. Burke and the Insurance Department, the county court reasoned that, because the statutory definition of ABA centers on environmental considerations, the place of services -- at least as it pertains to a venue where a patient spends a substantial amount of his or her waking hours -- cannot be decoupled from the services themselves. *See id.* at 9, 2011 WL 10525398, at *5 ("[E]ven though [Anthony] is covered for ABA outside of the school setting, [Insurer's] interpretation would render meaningless the mandate that insurance carriers cover 'the treatment of autism spectrum disorders.'" (quoting 40 P.S. §764h(a)). The court further pronounced that: "The delivery of ABA services in a school environment has been proven effective as a treatment for autism spectrum disorder[s]." *Id.*

In terms of the IDEA, the court found no compelling reason to believe that the General Assembly designed the Autism Coverage Law to require private-insurance coverage for treatment only where it was previously unavailable. In support, the court posited that legislatures "commonly create overlapping statutes as a way to ensure some particular result." *Id.* at 5, 2011 WL 10525398, at *3; *see also id.* (indicating that "[a] rule of statutory construction that presumed that every statutory scheme was sole lord and sovereign over the facts it was designed to address would require drastic reimagining of, for example, the Rehabilitation Act and the Americans with Disabilities

Act, or of the Clean Water Act; or the Resource Conservation and Recovery Act and the Comprehensive Environmental Response, Compensation and Liability Act of 1980.").[10]

Insurer appealed to the Superior Court. After an initial round of review concerning jurisdiction,[11] the Superior Court affirmed in a divided opinion and remanded for a determination of any damages. *See Burke ex rel. Burke v. Indep. Blue Cross*, 128 A.3d 223, 234 (Pa. Super. 2015). Centrally, the majority agreed with the common pleas court's assessment that the Law requires Insurer to extend coverage for ABA services delivered in school, despite the general exclusion in the Policy. *See id.*

At the outset of its opinion, the majority addressed Insurer's contention that the appeal was "moot," because Mr. Burke did not allege that any ABA services had, in fact, been provided to Anthony at his parochial school, and he did not seek any damages for any expenses that they may have incurred for ABA services after Insurer denied his request for coverage. The majority rejected these contentions based upon exceptions to the mootness doctrine. *See Burke*, 128 A.3d at 227-28.[12] Further, the majority

---

[10] In terms of the Insurance Department's position, the common pleas court rejected a required-deference approach but nevertheless decided the case in a manner that was consistent with core assertions by the agency. *See id.* at 8, 2011 WL 10525398, at *4.

[11] The Superior Court initially concluded that the common pleas court lacked subject matter jurisdiction over the case; however, this Court reversed and remanded for consideration of the appeal's merits. *See Burke ex rel. Burke v. Indep. Blue Cross*, 628 Pa. 147, 162, 103 A.3d 1267, 1276 (2014). Specifically, we determined that, although a statutory appeal was unavailable to Mr. Burke, the matter should have been treated as in the nature of a declaratory judgment proceeding. *See id.* at 159-61, 103 A.3d at 1274-75.

[12] In its petition for allowance of appeal, Insurer attempted to present a claim that the Superior Court's decision was purely advisory, and a nullity, on account of Mr. Burke's purported failure to request coverage after the Autism Coverage Law became effective. This Court, however, specifically declined to accept review of the question. After oral argument before this Court, Insurer then filed an application for leave to file a post-
(continued…)

tailored its remand directive to incorporate a requirement for the common pleas court to determine "whether any services were actually provided to [Anthony] during the stipulated time period and what, if anything, he had to pay out-of-pocket for services rendered." *Id.* at 229.

Proceeding to the sole stipulated issue, the majority agreed with the common pleas court's finding of an inherent ambiguity or conflict between the Law's central requirement of coverage for treatment of autism spectrum disorders, including ABA, and its allowance for general exclusions. Like the county court, the majority found that implementation of in-school exclusions would undermine the statute's core mandate. *See id.* at 233 ("By including ABA services among a specific list of treatments that insurance carriers must cover, we agree with the trial court that the legislature did not intend for ABA services to be excluded from coverage for a particular child because of where those services would be provided."). With reference to the Department's parallel

---

(…continued)
submission communication, again attempting to raise this concern (among several others).

We note that all of the conditions underlying the assertions of mootness and abstractness being presented by Insurer existed at the time that the parties entered their stipulation that: "The only issue before this court going forward is whether or not Act 62 voids the 'place of service' exclusion in the Independence Blue Cross policy for the period of January 1, 2010 through July 1, 2010." From our point of view, this agreement diminishes Insurer's standing to advance, during the ensuing appellate process, previously-available supplementary claims.

We appreciate both that Insurer has retained appellate counsel and that the types of concerns that it wishes to raise can be considered by this Court of its own accord. Nevertheless, in light of the parties' stipulation -- as well as the public importance of deciding the issue before us, *see Burke*, 628 Pa. at 155, 103 A.3d at 1271-72 -- we are disinclined to do so.

assessment, the majority afforded this "some weight" and indicated that the interpretation was supported by the rules of statutory construction. *Id.*[13]

Former Justice, now Senior Judge Fitzgerald authored a dissenting opinion. While commenting that the provision of insurance coverage for autism-related services is a laudable goal, he discerned no statutory basis to support the majority's construction. *See Burke*, 128 A.3d at 234 (Fitzgerald, S.J., dissenting) ("If our Legislature intended for private health insurers to cover ABA services provided in schools, then it could have explicitly excluded such services from the limiting provision at 40 P.S. §764h(c).").

In the present briefing to this Court, Insurer maintains its central position that the plain language of the Autism Coverage Law permits it to deny coverage for services in a school setting pursuant to the place-of-services exclusion in the Policy. *See, e.g.*, Brief for Appellant at 11 ("The Superior Court Majority clearly ignored the unambiguous language of Act 62 when it eliminated, in wholesale fashion, an exception in Act 62 that permitted insurers to apply general exclusions in their policies to services covered by Act 62."). The company criticizes the intermediate court's holding, along with that of the county court, for ignoring plain statutory terms "under the pretext of pursuing [the statute's] purpose." *Id.*; *see also id.* at 13, 16 (charging that the appellate-court majority invaded the province of the Legislature and acted by "judicial fiat"). In this regard, Insurer stresses that all provisions of a statute must be given effect. *See, e.g.*, *id.* at 23 ("If the General Assembly intended the specified services to be covered irrespective of

---

[13] As to the IDEA, the majority indicated that the federal statute could not be read to require school districts to provide services to disabled children who have enrolled voluntarily in private schools. *See id.* at 233-34 (collecting cases). Again, Insurer has not carried its arguments concerning the IDEA into its presentations to this Court; therefore, we decline to afford further consideration to the company's previous arguments on this point.

any exclusion or limitation in the policy, as the Department interprets the Act, the general exclusions language would be mere surplusage, which is impermissible under statutory construction principles." (citing, *inter alia*, 1 Pa.C.S. §§1921(a) and (b)). Insurer additionally highlights that neither courts nor administrative agencies are at liberty to deviate from explicit terms of a statute in pursuit of some perceived contrary purpose. *See, e.g.*, *id.* at 20 (citing *Pa. Sch. Bds. Ass'n, Inc. v. PSERB*, 580 Pa. 610, 623, 863 A.2d 432, 440 (2004)).

For his part, Mr. Burke continues to advance his position that there is an essential conflict between the statutory mandate requiring insurers to afford coverage for ABA and an exclusion of coverage for in-school services. According to Mr. Burke, Insurer's reading isolates the language pertaining to exclusions from the remainder of the Law, contrary to this Court's decisions. *See, e.g.*, *A.S. v. PSP*, ___ Pa. ___, ___, 143 A.3d 896, 906 (2016) (emphasizing the role of context in performing statutory construction). Mr. Burke also maintains that ABA is unique among the services defined in Act 62 in that the "environment" in which the service takes place is an integral part of the service, explaining that:

> [Insurer's] coverage of ABA in the home does not save [the] exclusion of ABA in the environment of school. The home environment is very different than school. Anthony Burke's home environment includes Anthony's parents and brother while the school environment includes other students and teachers. Interacting appropriately with adults and peers who are not family presents many different challenges than interacting with immediate family members. The school environment also includes stressors from academic activities which are the central focus of school but not typically of home. Different behavioral expectations may well exist between school and home.

Brief for Appellee at 10.[14]  It is Mr. Burke's contention that excluding coverage of ABA in school would "render hollow" Act 62's mandate of coverage of ABA.   Brief for Appellee at 8 (quoting *Ins. Fed'n of Pa., Inc. v. Com. Ins. Dep't*, 601 Pa. 20, 36, 970 A.2d 1108, 1118 (2009)).[15]  The Insurance Department has submitted a supportive *amicus* brief.

Upon review, we agree with Mr. Burke that the Autism Coverage Law is materially ambiguous in relevant aspects.   Initially, the statute indicates that the mandatory coverage is subject to "copayment," "deductible," and "coinsurance" provisions and "*any other*" general exclusions or limitations.   40 P.S. §764h(c) (emphasis added).   Ordinarily, one would expect the substance of a catchall provision opening with the term "any other" to connote items of a similar class or character as preceding ones.  *Accord* 1 Pa.C.S. §1903(b) (reflecting the principle of *ejusdem generis*, *i.e.*, that "[g]eneral words shall be construed to take their meanings and be restricted by preceding particular words").[16]   "Exclusions," however, are of a substantially different

---

[14] Community Behavioral Health – a non-profit corporation that contracts with the City of Philadelphia to manage the delivery of certain behavioral health services – has filed an *amicus* brief on the Burkes' behalf, substantially elaborating upon their position in the above respects.  *See, e.g.*, Brief for *Amicus* Cmty. Behavioral Health at 3 (contending that Insurer's "antiquated exclusion policy literally cripples therapists' use of peer integration as a treatment opportunity in a most opportune environment").

[15] Mr. Burke supplements the arguments that he presented to the common pleas and intermediate courts with a number of other contentions that we find it unnecessary to address here.

[16] In response to the dissent, we are not applying the principle of *ejusdem generis* at this juncture, but rather, are addressing the statute's use of the word "other" and commenting on the attendant awkwardness, which exacerbates the material ambiguity discussed below.  The contrary approach of simply disregarding the associating term "other," as the dissent apparently would do, *see* Dissenting Opinion, *slip op.* at 4 n.3, is in tension with the axiom that all words are to be given effect if possible.  *See* 1 Pa.C.S. §1921(a); *Northwood Constr. Co. v. Twp. of Upper Moreland*, 579 Pa. 463, 478 n.11, (continued…)

nature from copayments, deductibles, and coinsurance, given, for example, that exclusions can operate to foreclose coverage for entire categories of risk and treatment (contrasting with merely spreading a portion of treatment costs to others). In other words, conceptually, it is disharmonious to envision copayments, deductibles, and coinsurance as "exclusions," such that there could be "*other* general exclusions" along the lines of such offsets.[17]

Moreover, as previously related, Insurer acknowledged in the common pleas court that insurers simply cannot invoke general exclusions to deny coverage for an entire category of treatment for which coverage is otherwise specifically required by the Autism Coverage Law. *See* Defendant's Memorandum at 10 n.16 ("[W]hen a policy does not include prescription drug benefits, as many policies do not, the autism mandate would require that autism-related prescription drugs be covered notwithstanding that the policy did not cover any other prescription drugs."). In the context of this materially ambiguous statute, therefore, there is some unstated line

---

(…continued)
856 A.2d 789, 799 n.11 (2004) (explaining that the Court is "not at liberty to ignore" statutory terms).

[17] To comport more closely with Insurer's position, the statute would be better written as follows:

> Coverage under this section shall be subject to copayment, deductible and coinsurance provisions**,** ~~and any other~~ general exclusions**, or any other general** limitations of a health insurance policy . . .

Such formulation would widen the scope of the initially-enumerated items and encompass a subsequent catchall term broad enough to subsume those foregoing items.

between permissible and impermissible general exclusions that must be discerned through the application of principles of statutory construction.[18]

The Insurance Department's construction of the statute in its notice seeks to resolve this ambiguity by *per se* forbidding exclusions foreclosing coverage pertaining to the categories of care specified in the Law (*i.e.,* "medically necessary pharmacy care, psychiatric care, psychological care, rehabilitative care and therapeutic care," 40 P.S. §764h(f)(14)). As stated in the notice, however, this construction does not answer the question of whether a reasonable place-of-service exclusion would be permissible.[19] Relative to an in-school exclusion, the Department closes this gap in its *amicus* brief via the assertion that application of such an exclusion to in-school services would "eviscerate the statutory mandate to cover ABA services." Brief for *Amici* Pa. Ins. Comm'r & Pa. Ins. Dep't at 12.

With respect to the Insurance Department's position that the Legislature did not intend to permit exclusions that would eviscerate aspects of the coverage for autism

---

[18] In this regard, we reject Insurer's assertions that the Superior Court majority, by invoking the tools of statutory construction, acted by "judicial fiat," under pretext, or otherwise improperly. Rather, as in so many other instances, the intermediate court was faced with experimental, remedial legislation which does not appear to have anticipated that substantial difficulties would arise in the application and, thus, is unclear concerning important details.

The dissent's categorical approach (which is apparently that *all* general exclusions are permissible, including ones which would obviate pillars of the coverage otherwise provided for in the Autism Coverage Law such as pharmacy care), is contrary to Insurer's own argument as noted above and is manifestly inconsistent with the statutory scheme of which Section 764h(c) is a part. *Accord Burke*, 128 A.3d at 233; *Burke*, No. 2226, Feb. Term 2010, *slip op.* at 4, 2011 WL 10525398, at *2.

[19] For example, if it is immaterial *where* ABA treatment is conducted, the Insurance Department's assertion that the services "must be provided" apparently would be vindicated via the provision of out-of-school therapy. Pa. Ins. Dep't, Autism Coverage; Notice 2009-03, 39 Pa. Bull. at 1927.

treatment services that the Assembly has provided are mandatory, we find this to be soundly supported through the application of principles of statutory construction. These include our consideration of the occasion and necessity for the statute, the circumstances under which it was enacted, the mischief to be remedied, the object to be attained, the consequences of the particular interpretation, the contemporaneous legislative history, and the administrative interpretation of the statute. *See* 1 Pa.C.S. §1921.

Plainly, and as recognized by Insurer before the common pleas court, the General Assembly sought to aid autistic children and youth and their families -- and to alleviate the need for them to resort to governmental medical assistance -- by tasking private insurers with shouldering, at least in large measure, the financial burden of medically-necessary treatments for the condition. Accordingly, we agree that the Legislature intended to permit only general exclusions that would not substantially undermine the mandatory coverage requirement.

Our determination in this regard is also supported by the *ejusdem generis* principle. *See* 1 Pa.C.S. §1903(b). Again, since copayments, deductions, and coinsurance are forms of offset that do not substantially undermine coverage for treatment of any particular type, we take the Law's ambiguous allowance for "other general exclusions" to mean not only exclusions that are not targeted to autism-related services, but also those of a type which do not defeat the mandatory coverage specified in the statute. 40 P.S. §764h(c).[20]

---

[20] We do not regard the present case as an apt opportunity to delve into the various degrees of judicial deference afforded to administrative agencies in different settings. *See, e.g.*, *Nw. Youth Servs., Inc. v. DPW*, 620 Pa. 140, 157-59, 66 A.3d 301, 311-13 (2013). Here, we simply observe that our own application of principles of statutory construction comports with that of the Insurance Department, as related in its notice.

(continued…)

Finally, we will consider Mr. Burke's and his *amici*'s assertion that enforcement of the Policy's exclusion for in-school services would substantially undermine the Law's coverage mandate. Since the statute requires coverage for specified forms of care that are "medically necessary," 40 P.S. §764h(f)(14), the analysis on this point collapses into a more conventional assessment of medical necessity serving as a litmus for coverage. *See, e.g.*, *Tagliati v. Nationwide Ins. Co.*, 720 A.2d 1051, 1055-58 (Pa. Super. 1998) (considering whether a particular diagnostic procedure was medically necessary so as to meet the threshold for mandatory first-party benefits coverage under the financial responsibility statute pertaining to motor vehicles). In this regard, the issue further devolves to whether provision of ABA therapy *in school* is medically necessary, or whether *out-of-school* treatment might be sufficient to meet the treatment need.

It is significant, as Insurer highlights, that the record presented to us is lacking in factual support, and the issue of medical necessity is one which is often fact-bound. *See, e.g.*, *Moure v. Raeuchle*, 529 Pa. 394, 406-07, 604 A.2d 1003, 1009 (1992) (reflecting review of a jury determination subsuming considerations of medical

--------

(…continued)

We also find insufficient evidence in the statute to suggest that the Legislature intended for private insurance coverage to depend on the unavailability of services funded by governmental entities or others, such as those which may be offered in school. *Accord Burke*, No. 2226, Feb. Term 2010, *slip op.* at 5, 2011 WL 10525398, at *3 ("There is no compelling reason to believe that the General Assembly drafted [the Law] with the intention of ensuring autism treatment only in situations in which that treatment was previously unavailable."). Although the statute is also materially ambiguous in this regard, the very limited coordination-based provision in the Law suggests that the Legislature did not wish to adjust the responsibility of private insurance companies on account of services which otherwise might be offered in schools. *See* 40 P.S. §764h(d.1) ("Coverage for the treatment of autism spectrum disorders shall not be contingent upon a coordination of services with an individualized education program."). Moreover, one of the main purposes of the Law, as recognized by Insurer, was to relieve families of the necessity to rely upon government assistance in assuring care for their children. *See supra.*

necessity).  *See generally* Jeffrey R. Sang, *First-Party Insurance Coverage for Medically Necessary Treatment*, 15 AM. JUR. POF 3d 355 (2017) (discussing complexities involved in defining and determining medical necessity).  Moreover, the conclusion that treatment is medically necessary plainly encompasses medical judgment, and this Court is circumspect about making appellate-level pronouncements about such matters.

Nevertheless, as Mr. Burke stresses and the Law explicitly recognizes, ABA is an environmentally sensitive form of therapy.  Ultimately, we simply do not believe that the Legislature intended to permit insurers to exclude coverage in the sensory-laden educational environment where children spend large portions of their days, or to require families to litigate the issue of medical necessity discretely in individual cases to secure such location-specific coverage for the treatment.  We also take some guidance from the fact that the General Assembly discussed coordination of coverage with individual education programs in schools, although we recognize that only a modest amount of weight can be allocated to this point.  *See* 40 P.S. §764h(d.1).[21]  Additionally, we construe the statute liberally, in furtherance of its remedial aims, *see* 1 Pa.C.S. §1928(c), and, again, note that the Insurance Department's position is in alignment.

We hold that the Policy's place-of-services exclusion is ineffective, under the Autism Recovery Law, to foreclose coverage for ABA treatment provided at school.

The order of the Superior Court is affirmed and the matter is remanded, through the Superior Court to the common pleas court, for further proceedings consistent with this opinion and the intermediate court's previous remand directive.

Jurisdiction is relinquished.

---

[21] Our reluctance to accord too much weight to the statute's allusions to such coordination is on account of the observation, reflected in Insurer's presentation, that the Legislature could have specifically indicated that coverage for in-school services was mandatory, but it did not do so.

Justices Baer, Donohue and Dougherty join this opinion.

Justice Mundy files a dissenting opinion.

Justice Todd did not participate in the decision of this case.

Justice Wecht did not participate in the consideration or decision of this case.